1  Mark D. Kremer (SB# 100978)
    *m.kremer@conklelaw.com*
2  Evan Pitchford (SB# 256536)
    *e.pitchford@conklelaw.com*
3  Zachary Page (SB# 293885)
    *z.page@conklelaw.com*
4  CONKLE, KREMER & ENGEL
    Professional Law Corporation
5  3130 Wilshire Boulevard, Suite 500
    Santa Monica, California 90403-2351
6  Phone: (310) 998-9100 • Fax: (310) 998-9109

7  Attorneys for Plaintiffs Moroccanoil, Inc
    and Moroccanoil Israel Ltd.

8

9                  UNITED STATES DISTRICT COURT

10      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

12  MOROCCANOIL, INC., a California          CASE No. 2:16-cv-07004-DMG-AGR
    corporation; and MOROCCANOIL
13  ISRAEL LTD., an Israeli limited          **PLAINTIFF MOROCCANOIL,**
    company,                                 **INC.'S NOTICE OF MOTION AND**
14                                           **MOTION FOR PRELIMINARY**
              Plaintiffs,                    **INJUNCTION**
15
        v.                                   [Appendix of Supporting Declarations
16                                           and Exhibits and [Proposed] Order filed
    ZOTOS INTERNATIONAL, INC., a             concurrently herewith.]
17  New York corporation; and DOES 1
    through 20, inclusive,                   Date:    December 9, 2016
18                                           Time:    2:00 p.m.
              Defendants.                    Crtrm.: 8C
19
20                                           Hon. Dolly M. Gee, Presiding Judge
                                             Hon. Alicia G. Rosenberg, Magistrate
21                                           Judge
                                             Complaint filed: September 16, 2016
22

23

24                     **REDACTED VERSION**

25           **(UNREDACTED VERSION FILED UNDER SEAL)**

26

27

28

2522.714\9986

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................... 1

II.   FACTUAL BACKGROUND ............................................................... 2

III.  LEGAL ARGUMENT .......................................................................... 8

    A.    REQUIREMENTS FOR AND PRINCIPLES UNDERLYING PRELIMINARY INJUNCTIONS ................................................ 8

    B.    MOROCCANOIL IS LIKELY TO SUCCEED ON THE MERITS OF ITS INFRINGEMENT CLAIMS AGAINST ZOTOS ................................................................................................... 9

        1.    The Moroccanoil Trademarks Are Registered and Incontestable ....................................................................... 9

        2.    The Moroccanoil Trade Dress Is Valid, Non-Functional and Protectable ............................................ 10

            (a)    The Moroccanoil Trade Dress is Not Functional ............. 10

            (b)    The Moroccanoil Trade Dress is Inherently Distinctive ........................................................................ 10

            (c)    Even If Not Inherently Distinctive, the Moroccanoil Trade Dress Has Acquired Secondary Meaning .............. 11

        3.    The Majestic Oil Products Are Likely to Cause Confusion ....... 12

            (a)    The Marks and Trade Dress Are Substantially Similar ............................................................................ 13

            (b)    The Products Are Identical Types .................................... 15

            (c)    The Moroccanoil Trademarks and Trade Dress Are Strong ............................................................................. 15

            (d)    The Parties' Products Are Sold in the Same Channels of Trade ........................................................... 16

            (e)    Zotos Intended to Confuse Consumers ............................ 17

            (f)    Plaintiffs' Survey Evidence Shows Actual Confusion ........................................................................ 17

            (g)    Consumers Are Unlikely to Exercise Care When Purchasing Defendant's Products .................................... 18

-i-

C.    MOROCCANOIL IS LIKELY TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF ............... 18

    1.    Irreparable Harm is Common in Trademark Contexts, and Moroccanoil's Evidentiary Threshold is Low ........................... 18

    2.    Irreparable Harm in the Trademark Context ............................ 20

    3.    The Evidence Demonstrates that Moroccanoil Is Likely to Be Irreparably Harmed by the Infringing Majestic Oil Products ............................................................................. 22

D.    THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR ........................................................................... 24

E.    AN INJUNCTION IS IN THE PUBLIC INTEREST .......................... 25

IV.    CONCLUSION ............................................................. 25

**TABLE OF AUTHORITIES**

**Page**

<u>**FEDERAL CASES**</u>

*Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*,
944 F.2d 1446 (9th Cir. 1991)..................................................................16

*adidas Am., Inc. v. Skechers USA, Inc.*,
149 F. Supp. 3d 1222 (D. Or. 2016)........................................................21

*Adidas-Salomon AG v. Target Corp.("Target")*,
228 F. Supp. 2d 1192 (D. Or. 2002).........................................................11

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011).....................................................................8

*Am. Rena Int'l Corp v. Sis-Joyce Int'l Co.*,
2012 WL 12538385 at *9 (C.D. Cal. 2012)..........................................20, 21

*AMF, Inc. v. Sleekcraft Boats ("Sleekcraft")*,
599 F.2d 341 (9th Cir.1979)......................................................................13

*Brookfield Communs. v. W. Coast Entm't Corp.*,
174 F.3d 1036 (9th Cir. 1999)..........................................................9, 18, 25

*Cinedigm Corp. v. Gaiam Inc.*,
2015 WL 2084590 at *8 (C.D. Cal. 2015)................................................19

Clamp Mfg. Co. v. Enco Mfg. Co.,
870 F.2d 512 (9th Cir. 1989)......................................................................11

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
251 F.3d 1252 (9th Cir. 2001)..............................................................9, 15

*CytoSport, Inc. v. Vital Pharm., Inc.*,
617 F. Supp. 2d 1051 (E.D. Cal. 2009).....................................................24

*Dallas Cowboys Football Club, Ltd. v. Am.'s Team Properties, Inc.*,
616 F. Supp. 2d 622 (N.D. Tex. 2009)......................................................17

*Davidoff & Cie, S.A. v. PLD Int'l Corp.*,
263 F.3d 1297 (11th Cir.2001)...................................................................25

*Dep Corp. v. Opti-Ray, Inc.*,
768 F. Supp. 710 (C.D. Cal. 1991)............................................................18

*Disc Golf Ass'n v. Champion Discs*,
158 F.3d 1002 (9th Cir. 1998)....................................................................10

*Dish Network L.L.C. v. Ramirez*,
2016 WL 3092184 at *6 (N.D. Cal. 2016)................................................20

*Dr. Seuss Enter., L.P. v. Penguin Books, U.S.A.*,
  109 F.3d 1394 (9th Cir. 1997) ............................................................... 24

*Dreamwerks Prod. Group, Inc. v. SKG Studio*,
  142 F.3d 1127 (9th Cir. 1998) ............................................................... 16

Drop Dead Co. v. S.C. Johnson & Son, Inc.,
  326 F.2d 87 (9th Cir.1963) .................................................................... 13

*Earth Island Inst. v. U.S. Forest Serv.*,
  351 F.3d 1291 (9th Cir. 2003) ............................................................... 19

*Extreme Reach, Inc. v. Spotgenie Partners, LLC*,
  2013 WL 12081182 at *7 (C.D. Cal. 2013) ........................................... 21

*Fed. Trade Comm'n v. Wealth Educ., Inc.*,
  2015 WL 11439063 at *5 (C.D. Cal. 2015) ............................................. 8

First Brands Corp. v. Fred Meyer, Inc.,
  809 F.2d 1378 (9th Cir.1987) ................................................................ 12

*GoTo.com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2000) ................................................................. 8

*Grey v. Campbell Soup Co.*,
  650 F. Supp. 1166 (C.D. Cal. 1986) ...................................................... 17

*Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ............................................................... 19

*Johnson v. Couturier*,
  572 F.3d 1067 (9th Cir. 2009) ................................................................. 8

*Kalologie Franchising LLC v. Kalologie Skincare Med. Grp. of California*,
  2014 WL 953442 at *5 (C.D. Cal. 2014) ............................................... 20

*Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*,
  735 F.3d 735 (7th Cir. 2013) ................................................................. 19

*Kreation Juicery, Inc. v. Shekarchi*,
  2014 WL 7564679 at *12 (C.D. Cal. 2014) ....................................... 8, 22

*Lisa Frank, Inc. v. Impact Int'l, Inc.*,
  799 F. Supp. 980 (D. Ariz. 1992) .......................................................... 11

*Maxim Integrated Prods., Inc. v. Quintana*,
  654 F.Supp.2d 1024 (N.D.Cal.2009) ..................................................... 20

*Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc. (Marc Anthony Cosmetics)*,
  57 F. Supp. 3d 1203 (C.D. Cal. 2014) ............................... 1, 10, 11, 15

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
  638 F.3d 1137 (9th Cir. 2011) ............................................................... 13

*Ocean Garden, Inc. v. Marktrade Co.*,
    953 F.2d 500 (9th Cir. 1991) ...................................................................................24

*OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*,
    602 F. App'x 669 (9th Cir. 2015) ..........................................................................21

*Pharmacia Corp. v. Alcon Labs., Inc.*,
    201 F. Supp. 2d 335 (D.N.J. 2002) ........................................................................17

*Puente Arizona v. Arpaio*,
    821 F.3d 1098, (9th Cir. 2016).................................................................................8

*QBAS Co. v. C Walters Intercoastal Corp.*,
    2010 WL 7785955 at *12 (C.D. Cal. 2010) ...........................................................20

*Quiksilver, Inc. v. Kymsta Corp.*,
    360 F. App'x 886 (9th Cir. 2009)............................................................................20

*Seed Servs., Inc. v. Winsor Grain, Inc.*,
    868 F. Supp. 2d 998 (E.D. Cal. 2012)...............................................................20, 21

*Starbucks Corp. v. Heller*,
    2014 WL 6685662 at *8 (C.D. Cal. 2014)........................................................19, 22

*Stark v. Diageo Chateau & Estate Wines Co.*,
    907 F. Supp. 2d 1042 (N.D. Cal. 2012)..............................................................8, 19

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
    240 F.3d 832 (9th Cir.2001)...................................................................................20

*Surfvivor Media, Inc. v. Survivor Prods.*,
    406 F.3d 625 (9th Cir. 2005)..................................................................................16

*Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*,
    601 F.2d 1011 (9th Cir. 1979)................................................................................11

*Thane Int'l v. Trek Bicycle Corp.*,
    305 F.3d 894 (9th Cir. 2002)..................................................................................18

*Toyo Tire & Rubber Co. v. Kabusikiki Kaisha Tokyo Nihoon Rubber Corp*,
    2015 WL 6501228 at *4 (D. Nev. 2015).................................................................22

*Toyo Tire Holdings Of Ams. Inc. v. Cont'l Tire N. Am., Inc.*,
    609 F.3d 975 (9th Cir. 2010)....................................................................................8

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992)................................................................................................10

*Wal–Mart Stores, Inc. v. Samara Brothers, Inc.*,
    529 U.S. 205 (2000)................................................................................................10

*Well Care Pharmacy II, LLC v. W' Care, LLC*,
    2013 WL 3200111 (D. Nev. 2013) .........................................................................21

*Wetzel's Pretzels, LLC v. Johnson*,
    797 F. Supp. 2d 1020 (C.D. Cal. 2011)..........................................................19

*Windsurfing Int'l v. AMF*,
    782 F.2d 995, 1003 n.12 (Fed. Cir. 1986).......................................................24


**FEDERAL STATUTES**

15 U.S.C. § 1114.......................................................................................................9

15 U.S.C. § 1125(a) .................................................................................................9


**OTHER AUTHORITIES**

*McCarthy on Trademarks*, § 24:22 (4th ed. 2010)..............................................15, 18

*In re Miles Labs. Inc.*,
    1 U.S.P.Q.2d 1445 (T.T.A.B. 1986).................................................................17

*McCarthy on Trademarks* § 30:46 (4th ed. 2010)...................................................20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   PLEASE TAKE NOTICE that on December 9, 2016 at 2:00 p.m. in Courtroom
2   8C of the United States District Court for the Central District of California, located at
3   350 W. 1st Street, Los Angeles, California 90012, before the Honorable Dolly M. Gee,
4   Plaintiff Moroccanoil, Inc. ("Plaintiff" or "Moroccanoil") will and hereby does move
5   the Court for entry of a preliminary injunction pursuant to Federal Rule of Civil
6   Procedure 65 against Defendant Zotos International, Inc. ("Defendant" or "Zotos").
7
8   Specifically, Moroccanoil seeks an order prohibiting Zotos, its agents and all
9   others acting in concert with Zotos, from further infringing Moroccanoil's trade dress
10  and federally registered trademarks.
11
12  This motion is based on this Notice of Motion and Motion, the accompanying
13  Memorandum of Points and Authorities, the Declarations and Exhibits concurrently
14  filed in support thereof, the files of this Court, the hearing of this matter, and such other
15  evidence as may be submitted to the Court.
16
17  Dated: November 10, 2016                    Mark D. Kremer
18                                              Evan Pitchford
                                                Zachary Page, members of
19                                              CONKLE, KREMER & ENGEL
20                                              Professional Law Corporation
21
22                                     By:  */s/ Zachary Page*
                                           _____
23                                          Zachary Page
                                            Attorneys for Plaintiffs
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This trademark and trade dress infringement action concerns Defendant Zotos International, Inc.'s ("Zotos") blatant misuse of Plaintiff Moroccanoil, Inc.'s ("Moroccanoil") trademarks and trade dress.

Since their introduction in 2007, Moroccanoil's products have been recognized as one of the most popular hair care lines in the United States. For almost ten years, Moroccanoil has cultivated a significant following, with major media outlets such as *Vogue* and CNN recognizing the dramatic impact Moroccanoil has had on the beauty industry. Zotos' introduction of the Majestic Oil line of products seeks to trade on Moroccanoil's success and notoriety by sowing confusion in the marketplace:

**Moroccanoil Products**                **Majestic Oil Products**



Zotos' intent to trade on Moroccanoil's intellectual property is readily apparent from the face of the products themselves. It is further evidenced by the fact that Zotos was secretly developing its infringing Majestic Oil line even while working with Moroccanoil under a Non-Disclosure Agreement to manufacture products for Moroccanoil.

The Majestic Oil line is nothing less than an attempt to misappropriate Moroccanoil's identity in the marketplace. Zotos' wholesale infringement of Moroccanoil's trademarks and trade dress is irreparably harming Moroccanoil's brand and its valuable goodwill in the Moroccanoil marks. This Motion simply requests that the Court issue a preliminary injunction to preserve the status quo that preceded Zotos' infringement of Moroccanoil's longstanding trademarks and trade dress.

## II.    FACTUAL BACKGROUND

### Moroccanoil's Inception, Success and Media Recognition

When Moroccanoil introduced its Moroccanoil Treatment, it was a unique professional hair care product featuring argan oil to revitalize and replenish hair. (Decker Rep. at ¶ 7) Moroccanoil quickly expanded its product line to include styling creams, masks, shampoo and conditioner. (Ex. 5 at p. 2) As shown below, each of these "original" Moroccanoil products prominently featured Moroccanoil's distinctive turquoise blue color, copper orange and white lettering, graphics and background design elements, the word "MOROCCANOIL" in vertical and horizontal orientation, and, for the Moroccanoil Treatment, an amber bottle packaged in a rectangular turquoise blue box (the "Moroccanoil Trade Dress").



Since then, Moroccanoil has further expanded its product line to include a full range of hair care products. As shown below in the image of a selection of the currently-offered Moroccanoil Products, the Moroccanoil Trade Dress has remained substantially unchanged, and has been used across Moroccanoil's entire hair care line.



From their inception nearly a decade ago, the Moroccanoil Products have been a tremendous success and garnered recognition and praise from celebrities, runway stylists, and consumers in the United States and throughout the world. (*See, e.g.,* Exs.

11, 14) This popularity has generated substantial unsolicited media coverage. For example, fashion magazine *Vogue* ran an article in 2010 titled "Beauty: The Frenzy over Moroccanoil." (Ex. 13) In the article, the author recounted running into a friend and noticing that her friend's hair, which "always looks perfect," looked even "better" than perfect that day. "'Did you just get a cut?' I asked. 'Nope, she said, 'it's Moroccanoil!' And that's when I realized Moroccanoil is everywhere." (*Id.*) And in 2012, CNN featured an in-depth segment on the history and success of the Moroccanoil Products, with anchor Erin Burnett describing Moroccanoil as "the hottest hair product in the world right now." (Ex. 12)

The Moroccanoil Products are also repeatedly featured in such widely-circulated magazines as *Elle* (over 4 million in circulation), *Marie Claire* (over 4 million), *People* (over 13 million) and *Us Weekly* (over 5 million). (Ex. 15) Other online publications, such as beauty product blogs, have repeatedly recognized the Moroccanoil Products, with many focusing on specific elements of the Moroccanoil Trade Dress. (*See* Ex. 16)

Moroccanoil has capitalized on this notoriety by making significant investments in advertising and marketing for its products. Since 2007, Moroccanoil has spent over ███████ in advertising directed to the United States. (Weizmann Decl. ¶ 4) These extensive ad campaigns prominently feature the products bearing the Moroccanoil Trade Dress. (Krzypow Decl. ¶ 4; Ex. 8) Moroccanoil has also been particularly successful in its marketing efforts on social media, where its Facebook page has nearly half a million followers, and its YouTube channel features videos with hundreds of thousands of views. (Exs. 9-10) As a result of the superior quality of the Moroccanoil Products and Moroccanoil's advertising efforts, it has sold more than ███████ units of the Moroccanoil Products in the United States, with sales in excess of ███████ since 2007. (Weizmann Decl. ¶¶ 2-3)

### Moroccanoil's Sales and Distribution Channels

One of the Moroccanoil brand's defining characteristics is its dedication to the professional channels, such as salons and spas, that ensured its early success.

Moroccanoil's products can be found in over 20,000 salons throughout the United States. (Elarar Decl. ¶ 20) In addition to salons and spas, the Moroccanoil Products are also sold on Moroccanoil's website, through select major retailers such as Saks, Neiman Marcus, Barneys and Nordstrom, in high-end cosmetics retailers such as Sephora, and in upscale beauty supply stores such as Planet Beauty and Design Collection. (*Id.* at ¶¶ 7-8)

Moroccanoil's efforts to maintain the integrity of its distribution network are extensive. Moroccanoil requires its distributors to sign distribution agreements restricting the retail outlets to which they can sell to authorized salons and spas. (*Id.* at ¶ 4; Wilson Decl. at ¶ 4) To enforce these restrictions, Moroccanoil employs various tracking mechanisms including markings on the Moroccanoil Products' packaging by which it can track products that are diverted to unauthorized retail channels. (Wilson Decl. at ¶ 5; Ex. 18) Indeed, Moroccanoil is recognized in the beauty industry as a leading fighter of diversion. (Decker Rep. at ¶ 10; Exs. 18-20) Despite these efforts, the Moroccanoil Products are diverted into non-authorized outlets, such as Amazon and eBay, as well as various retailers' and beauty supply websites, including Wal-Mart, Sears, and Sleekhair Beauty. (Ex. 21)

## Moroccanoil's Trademarks and Enforcement Efforts

Moroccanoil is the owner of numerous trademark registrations relating to the Moroccanoil Products, including two registrations on variations of the "M Moroccanoil Design"—one with the word "Moroccanoil" in white vertical lettering next to the letter M in copper orange on a turquoise blue background, the other with the word "Moroccanoil" in horizontal lettering (Reg. Nos. 3,684,910 and 3,684,909) (the "Vertical Design Mark" and "Horizontal Design Mark", collectively, the "Moroccanoil Trademarks"). (Exs. 3-4) As noted in these registrations, Moroccanoil began using the Moroccanoil Trademarks in 2007. (*Id.*) The Moroccanoil Trademarks were registered on September 22, 2009, and a declaration of incontestability for each of the

PLAINTIFF MOROCCANOIL. INC.'S MOTION FOR PRELIMINARY INJUNCTION

Moroccanoil Trademarks was accepted and acknowledged by the United States Patent and Trademark Office ("USPTO") on January 9, 2015. (*Id.*)

**Vertical Design Mark**
**(Reg. No. 3,684,910)**       **Horizontal Design Mark**
                              **(Reg. No. 3,684,909)**



Due to Moroccanoil's success, numerous competing products and brands have emerged that have wrongfully used packaging that is confusingly similar to the Moroccanoil Trade Dress. (*See, e.g.,* Dkt. No. 4 (related infringement cases)) Moroccanoil has expended extensive resources successfully defending its intellectual property against such infringers and copiers, frequently through the judicial system. (Wilson Decl. at ¶ 7)

**Moroccanoil's Prior Dealings with Zotos**

Zotos is a major player in the hair care market, owned by industry behemoth Global Beauty Company Shiseido. Beginning in 2014, Moroccanoil explored a business relationship wherein Zotos would manufacture products for Moroccanoil. (Hoo Decl. ¶¶ 2-3) Though that proposed relationship never coalesced, Moroccanoil Israel and Zotos executed a Non-Disclosure Agreement to protect Moroccanoil's disclosure of certain trade secrets in furtherance of the parties' negotiations. (*Id.*)

**Zotos' Majestic Oil Products**

Unbeknownst to Moroccanoil, while the parties were exploring their business relationship, Zotos was secretly developing its own line of copycat argan oil products to be sold under the name "Majestic Oil" (the "Majestic Oil Products"). Beginning in or about August 2016, and continuing to this day, Zotos has marketed and sold the

Majestic Oil Products in packaging that is a direct copy of the Moroccanoil Trade Dress:



(Sands Decl. ¶ 35) The Majestic Oil Products deliberately use *all* the design elements of the Moroccanoil Trade Dress—similar name, similar coloration, nearly identical packaging, and similar orientation of text and symbols.  The primary retail outlet for the Majestic Oil Products appears to be the Sally chain of beauty supply stores. (*See* Exs. 24, 26) The Majestic Oil Products are also advertised on Zotos' website and sold via online retailers, including some that also sell diverted Moroccanoil Products, such as Amazon, eBay, Sleekhair Beauty, Sears, and Wal-Mart online stores. (Exs. 23, 25)

### Zotos' History of Copying Successful Brands

The obvious similarities between the Moroccanoil Products and the Majestic Oil Products is no accident—Zotos' business model is founded on copying other successful brands in the beauty industry. (*See, e.g.,* Ex. 33-36) For example, on the site glassdoor.com, a reviewer claiming to be a former Zotos employee criticized Zotos as "[s]hort-sighted, close-minded [and] backwards" due to Zotos' efforts to "develop[] knock-off versions of better brands' products."[1] (Ex. 31, p. 3) Consumers have also commented on Zotos' "knock-off" business strategy, noting that Zotos' KeraPRO product was "a knock-off of the Kerastase Oleo Relax line" and that Zotos' Aura

---

[1] Glassdoor is a website that features "a growing database of millions of company reviews, CEO approval ratings, salary reports, interview reviews and questions, benefits reviews, office photos and more." (Ex. 31 at p. 2)

Mousse Mallow Root product was "an Aveda knockoff" that used the "[s]ame packaging." (Ex. 32, pp. 3, 6, 7, 9, 10, 12, and 16)

Zotos has a reputation for copying the products and trade dress of other hair care manufacturers. (Decker Rep. ¶ 16) For example, Zotos' "Aura" products from its Naturelle line feature packaging that is an obvious copy of a product sold by Aveda:

| **Zotos' Aura Product** | **Aveda Product** |
|:---:|:---:|




(Ex. 36)

Zotos also sells several products in its Naturelle line under the name "Biotera" that copy the packaging of the Biolage products sold by Matrix:

| **Zotos' Biotera Line** | **Matrix' Biolage Line** |
|:---:|:---:|




(Ex. 33)

### Dr. Kamins' Likelihood of Confusion Survey

Moroccanoil has engaged the services of Dr. Michael Kamins of Stony Brook University to study the likelihood that consumers will be confused about the source or sponsorship of the Majestic Oil Products. Dr. Kamins conducted a likelihood of confusion survey that found that 41% of respondents believed that the Majestic Oil

1  Products either came from or were associated with Moroccanoil. (Kamins Rep. ¶ 44)

2  Survey respondents specifically identified elements of the Moroccanoil Trade Dress

3  when explaining why they believed the Majestic Oil Products came from or were

4  affiliated with Moroccanoil. (*See* Kamins Rep., Appx. F) Indeed, survey respondents

5  were not counted as "confused" unless they explicitly identified the packaging elements

6  at issue in their verbatim responses. (Kamins Rep. ¶¶ 35-41)

7  **III.  LEGAL ARGUMENT**

8    **A.    REQUIREMENTS FOR AND PRINCIPLES UNDERLYING**

9         **PRELIMINARY INJUNCTIONS**

10       A party seeking a preliminary injunction must establish: (1) that it is likely to

11  succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of

12  preliminary relief; (3) that the balance of equities tips in its favor; (4) and that an

13  injunction is in the public interest. *Toyo Tire Holdings Of Ams. Inc. v. Cont'l Tire N.*

14  *Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010). In the Ninth Circuit, "a preliminary

15  injunction is also appropriate when a plaintiff raises 'serious questions' as to the merits

16  and 'the balance of hardships tips sharply in plaintiff's favor.'"  *Puente Arizona v.*

17  *Arpaio*, 821 F.3d 1098, 1103 fn. 4 (9th Cir. 2016).

18       Because an injunction is an equitable remedy, the court may apply a sliding test,

19  under which "the elements of the preliminary injunction test are balanced, so that a

20  stronger showing of one element may offset a weaker showing of another." *All. for the*

21  *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, for example, as the

22  probability of success increases, the required likelihood of irreparable harm decreases.

23  *Stark v. Diageo Chateau & Estate Wines Co.*, 907 F. Supp. 2d 1042, 1050 (N.D. Cal.

24  2012); *Fed. Trade Comm'n v. Wealth Educ., Inc.*, 2015 WL 11439063 at *5 (C.D. Cal.

25  2015). In deciding a motion for a preliminary injunction, a court has broad discretion to

26  consider all arguments and evidence, including hearsay and evidence that is otherwise

27  inadmissible. *See, e.g., Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

28

-8-

1    The goal of a preliminary injunction in a trademark context is to preserve the

2    status quo—that is, to return to the state of affairs before the infringing use began.

3    *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). A preliminary

4    injunction similarly operates to prevent a defendant from continuing to "free ride" on a

5    plaintiff's efforts to promote its brand and establish goodwill. *Kreation Juicery, Inc. v.*

6    *Shekarchi*, 2014 WL 7564679 at *12 (C.D. Cal. 2014).

7    **B.    MOROCCANOIL IS LIKELY TO SUCCEED ON THE MERITS**
8    **OF ITS INFRINGEMENT CLAIMS AGAINST ZOTOS**

9    Moroccanoil has brought claims against Zotos under both section 32 of the

10   Lanham Act (15 U.S.C. § 1114) for infringement of the registered Moroccanoil

11   Trademarks and under section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) for

12   infringement of the Moroccanoil Trade Dress. For each of these claims, the Lanham

13   Act requires a plaintiff to show (1) it has a valid, protectable trademark or trade dress,

14   and (2) that a defendant is using a mark or trade dress that creates a likelihood of

15   consumer confusion. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258

16   (9th Cir. 2001), *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036,

17   1046-47 n. 8 (9th Cir. 1999).  Here, Moroccanoil is likely to succeed and "raises serious

18   questions" on the merits of its infringement claims against Zotos.

19

20   **1.    The Moroccanoil Trademarks Are Registered and**
21   **Incontestable**

22   When a mark's registration becomes incontestable, subject to a few select

23   defenses, the "validity and legal protectability, as well as the [registrant's] ownership

24   therein, are all conclusively presumed." *Brookfield*, 174 F.3d at 1046-47 n.10. The

25   Moroccanoil Trademarks have been registered with the USPTO since September 22,

26   2009, and those registrations became incontestable when declarations of

27   incontestability for each of the marks were filed in December 2014, and accepted and

28   acknowledged by the USPTO in January 2015. (*See* Exs. 3-4)

2.   **The Moroccanoil Trade Dress Is Valid, Non-Functional and Protectable**

Like the Moroccanoil Trademarks, the Moroccanoil Trade Dress is also valid and protectable. An unregistered trademark or trade dress is capable of being protected if it is non-functional and "*either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992) (emphasis in original).

(a)   **The Moroccanoil Trade Dress is Not Functional**

A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Disc Golf Ass'n v. Champion Discs*, 158 F.3d 1002, 1006 (9th Cir. 1998)). The Moroccanoil Trade Dress, including its distinctive color, shape and size of and placement of lettering on Moroccanoil's packaging, is not functional. There is nothing about the coloring or arrangement of the packaging elements that "affects the cost or quality" of the products, and there is no indication that Moroccanoil's exclusive use of the Moroccanoil Trade Dress puts competitors at a significant non-reputation related disadvantage. Indeed, numerous other argan oil products are available in the marketplace that do not feature any of the elements of the Moroccanoil Trade Dress. (*See, e.g.,* Ex. 38)

(b)   **The Moroccanoil Trade Dress is Inherently Distinctive**

The Supreme Court has held that product *packaging*, as opposed to product *design*, is typically inherently distinctive, and thus protectable without a showing of secondary meaning. *Wal–Mart Stores, Inc. v. Samara Brothers, Inc*., 529 U.S. 205, 212 (2000), *Two Pesos*, 505 U.S. at 773. By way of example, "a garish form of packaging (such as Tide's squat, brightly decorated plastic bottles for its liquid laundry detergent) may attract an otherwise indifferent consumer's attention on a crowded store shelf— their predominant function remains source identifications." *Wal-Mart*, 529 U.S. at 212.

As this Court has noted in prior litigation involving the Moroccanoil Trade Dress, "Moroccanoil's trade dress is inherently distinctive because, like a Tide bottle and colors, its function is identification." *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc. (Marc Anthony Cosmetics)*, 57 F. Supp. 3d 1203, 1222 (C.D. Cal. 2014). (citing *Wal-Mart Stores, Inc.*, 529 U.S. at 212, and *Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F. Supp. 980, 989 (D. Ariz. 1992)).

The Moroccanoil Trade Dress is based on elements of Plaintiffs' product packaging, none of which have any inherent meaning or any descriptive relationship to Plaintiff's products. Moroccanoil's product packaging is plainly inherently distinctive, as it does not "forthwith convey[] an immediate idea of the ingredients, qualities or characteristics of the goods." *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1019 (9th Cir. 1979). At a minimum, Moroccanoil's trade dress is suggestive (and therefore inherently distinctive) because "it requires imagination, thought and perception to reach a conclusion as to the nature of goods." *Id*. Thus, Moroccanoil's trade dress is protectable without a showing of secondary meaning. *See Two Pesos*, 505 U.S. at 773.

### (c)   Even If Not Inherently Distinctive, the Moroccanoil Trade Dress Has Acquired Secondary Meaning

Courts consider several factors when deciding whether secondary meaning exists for a particular trade dress, including: (1) whether actual purchasers associate the dress with the source; (2) the degree and manner of advertising; (3) the length and manner of use of the dress, and (4) exclusive use of the trade dress; (5) sales success; (6) attempts by others to imitate the mark; and (7) unsolicited media coverage. *See Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 517 (9th Cir. 1989); *Clicks Billiards*, 251 F.3d at 1266; *Lisa Frank*, 799 F.Supp. at 992. When evaluating the secondary meaning of a particular trade dress, the court should consider the trade dress as a whole, including elements of the trade dress that are the subject of a trademark registration. *Adidas-Salomon AG v. Target Corp.("Target")*, 228 F. Supp. 2d 1192, 1208 (D. Or. 2002).

1    Even if the Moroccanoil Trade Dress were not inherently distinctive,
2  Moroccanoil's millions of units in sales, millions of dollars in advertising and broad
3  recognition in the personal care market demonstrate that the Moroccanoil Trade Dress
4  has acquired distinctiveness through secondary meaning. Since its introduction, the
5  Moroccanoil Trade Dress has remained substantially unchanged, and has been used
6  across Moroccanoil's entire hair care line. (*See* Ex. 5)

7    The Moroccanoil Products have repeatedly appeared in widely-circulated
8  publications and media, such as *Vogue* and CNN, some of which have explicitly noted
9  the notoriety of the Moroccanoil Trade Dress.  The Moroccanoil Products' success has
10 made them a target for infringers, and Moroccanoil has constantly fought to prevent
11 others from copying the Moroccanoil Trade Dress or counterfeiting the Moroccanoil
12 Products. (*See* Dkt. No. 4 (related infringement cases); Wilson Decl. at ¶¶ 3, 7) Even
13 the USPTO has recognized that Moroccanoil has cultivated secondary meaning in
14 certain elements of the Moroccanoil Trade Dress.[2] (*See* Ex. 39)

15    Put simply, each and every factor considered in determining whether a mark or
16 trade dress has acquired distinctiveness supports a finding that the Moroccanoil Trade
17 Dress has secondary meaning. Thus, Moroccanoil is likely to prevail on the issue of
18 whether the Moroccanoil Trade Dress is valid and protectable.

19

20        **3.    The Majestic Oil Products Are Likely to Cause Confusion**

21    To determine whether a defendant's product is likely to cause confusion, the
22 Court should examine the "total effect of the defendant's product and package on the
23 eye and mind of an ordinary purchaser." *First Brands Corp. v. Fred Meyer, Inc.,* 809
24 F.2d 1378, 1383–84 (9th Cir.1987). As the Ninth Circuit has observed:

25  _____

26     [2] In July 2012, Moroccanoil applied for registration of its well-known turquoise-blue
27 packaging with a copper-orange M. The PTO ultimately found that Moroccanoil had established
   secondary meaning in that combination. (*See* Ex. 39) This Application has been opposed by Tiffany
   (NJ) LLC. (TTAB Opposition No. 91226739) That opposition is still pending.

28

It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them.

*Drop Dead Co. v. S.C. Johnson & Son, Inc.,* 326 F.2d 87, 96 (9th Cir.1963), *cert. denied,* 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964).

The Ninth Circuit has articulated a well-known eight factor test (the "*Sleekcraft* factors") to guide the determination of a likelihood of confusion: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 (9th Cir.1979) ("*Sleekcraft*") . Particular *Sleekcraft* factors may be either more important or irrelevant, depending on the nature of the case. *See, e.g., Network Automation, Inc. v. Advanced Sys. Concepts, Inc*., 638 F.3d 1137, 1145 (9th Cir. 2011).

### (a)    The Marks and Trade Dress Are Substantially Similar

No extended review of the Moroccanoil and Majestic Oil Products is necessary to conclude that the products' packaging is closely similar:

### Moroccanoil Products



**Majestic Oil Products**



| **Majestic Oil Treatment** | **Moroccanoil Treatment** |
|---|---|




| **Majestic Oil Masque** | **Moroccanoil Mask** |
|---|---|




Moreover, the Majestic Oil products bear marks that are confusingly similar to the Moroccanoil Trademarks. On the shampoo, conditioner, oil treatment and styling cream in the Majestic Oil line, the packaging features the term "Majestic Oil" arranged vertically in white letters on a blue background next to an orange design element. Each of these elements are taken from Moroccanoil's Vertical Design Mark. The same is true for the Majestic Oil mask product, which bears a mark that echoes Moroccanoil's

1   Horizontal Design Mark in that it bears all of the same elements (turquoise background

2   with horizontal lettering over an orange design element).

3

4   **(b)   The Products Are Identical Types**

5   Moroccanoil and Zotos both sell hair care products that contain argan oil,

6   including a shampoo, conditioner, mask, styling cream, and oil treatment. These goods

7   are not only similar – they are identical, and so "less similarity in the [trade dress] is

8   [required for] a finding of likelihood of confusion." *Sleekcraft*, 599 F.2d at 350

9   (applying a "diminished standard" for closely related but non-competing boats); ."

10   *McCarthy on Trademarks*, § 24:22 (4th ed. 2010).

11
12   **(c)   The Moroccanoil Trademarks and Trade Dress Are Strong**

13   As discussed at length earlier, Moroccanoil's remarkable success has been built

14   on consistent use of the Moroccanoil Trademarks and Trade Dress for years, and

15   significant investment in advertising and enforcement of its brand, leading to over ■

16   ■■■■ units and ■■■■■■■■ in sales, and wide recognition in the press. The strength

17   of the Moroccanoil Trademarks and Trade Dress is further evidenced by Zotos' intent

18   to copy, discussed below. *See Clicks Billiards, Inc. v. Sixshooters Inc*., 251 F.3d 1252,

19   1264 (9th Cir. 2001) ("deliberate copying may suffice to support an inference of

20   secondary meaning").

21   In *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*, 57 F. Supp. 3d 1203,

22   1219 (C.D. Cal. 2014), this Court has found that the Moroccanoil Trademarks are

23   "suggestive" and that the "strength of the mark" factor weighed in favor of finding

24   likely confusion with another infringer. This Court went on to find that the Moroccanoil

25   Trade Dress was also strong because its elements "are without meaning—they do not

26   describe the product" and that "[t]his factor thus weighs in favor of a likelihood of

27   confusion." *Id.* at 1225.

28

        (d)      **The Parties' Products Are Sold in the Same Channels of Trade**

The Moroccanoil Products are authorized for sale through its numerous retail partners, including salons and major retailers such as Saks, Neiman Marcus, Barneys and Nordstrom and select beauty supply stores such as Sephora. Moroccanoil also offers its products for sale on its own website. Though Moroccanoil undertakes significant efforts to ensure that its products are only sold in its authorized retail channels, the Moroccanoil Products are often diverted into non-authorized outlets, such as Amazon and eBay, as well as various retailers' and beauty supply websites, including Wal-Mart, Sears, and Sleekhair Beauty.

The primary brick and mortar retail outlet for Zotos' Majestic Oil products appears to be the Sally Beauty chain of beauty supply stores. Like Moroccanoil, the Majestic Oil products are also sold on Amazon, eBay and the Wal-Mart, Sears, and Sleekhair Beauty websites. Zotos also has its own website advertising the Majestic Oil Products. (Ex. 23) Indeed, the Moroccanoil products frequently appear on the very same product pages as the Majestic Oil Products. (*See* Ex. 25 at pp. 11, 19, 22, 31-32)

Even if consumers understand that the Moroccanoil Products are only authorized to be sold in the select high-end salons and upscale retailers, consumers may still be deceived by the Majestic Oil Products' similar trade dress into believing that those products are a lower cost version produced by Moroccanoil for distribution through mass market channels. (*See* Decker Rep. ¶ 18)

Thus, there is clear overlap between the market for the Moroccanoil Products and the market for Majestic Oil products, and this factor weighs in Moroccanoil's favor. *See Surfvivor Media, Inc. v. Survivor Prods*., 406 F.3d 625, 633-34 (9th Cir. 2005 (finding that this factor favored a finding of confusion even if there was only "minor overlap" in the marketing channels).

### (e)    Zotos Intended to Confuse Consumers

Evidence of intent or bad faith is not necessary in showing a likelihood of confusion. *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1132 n.12 (9th Cir. 1998). However, "[w]hen one party knowingly adopts a mark similar to another's, reviewing courts presume that the defendant will accomplish its purpose, and that the public will be deceived." *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc*., 944 F.2d 1446, 1456 (9th Cir. 1991).

There cannot be any dispute that Zotos was aware of the Moroccanoil Trademarks and Trade Dress when it created and began selling the infringing Majestic Oil products. Not only did Zotos and Moroccanoil have direct business dealings relating to the Moroccanoil Products prior to the introduction of Zotos' Majestic Oil Products, but Zotos specifically references Moroccanoil in some of its advertising materials for the Majestic Oil Products. (*See* Exs. 23, 27, 29) *Grey v. Campbell Soup Co.*, 650 F. Supp. 1166, 1173 (C.D. Cal. 1986), *aff'd,* 830 F.2d 197 (9th Cir. 1987) (finding intent to deceive where plaintiff had been aware of defendant's mark prior to adopting her own mark). This intentional infringement is part and parcel of Zotos' "knock-off" business model, as recognized by consumers and Zotos' former employees alike. (Decker Rep. at ¶ 16; Exs. 31-36) Zotos' intentional effort to trade on Moroccanoil's goodwill and to deceive consumers strongly favors a finding of likelihood of confusion.

### (f)    Plaintiffs' Survey Evidence Shows Actual Confusion

Survey confusion rates as low as 15 to 20% have been considered by courts to support a finding of likelihood of confusion. *See, e.g., In re Miles Labs. Inc*., 1 U.S.P.Q.2d 1445 (T.T.A.B. 1986) (18.1 percent confusion "is well within the range of percentages accepted as probative by courts in infringement proceedings"); *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Properties, Inc*., 616 F. Supp. 2d 622, 641 (N.D. Tex. 2009) (survey showing 19 percent confusion is "within the range accepted

by courts—generally 15 percent—in assessing likelihood of confusion"); *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 380 (D.N.J. 2002) (15 to 20% range supports finding of confusion). Dr. Kamins' survey found that 41% of respondents believed that the Majestic Oil products were manufactured by or associated with Moroccanoil. This serves as evidence of actual confusion.[3] *See, e.g., Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002).

**(g)     Consumers Are Unlikely to Exercise Care When Purchasing Defendant's Products**

"The ordinary prudent purchaser does not give much care or thought to the everyday purchase of relatively inexpensive items." *McCarthy on Trademarks*, §23:95 (4th ed. 2010); *see also Brookfield Communs. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1060 (9th Cir. 1999) (less confusion expected when goods at issue are expensive). In this case, Zotos' products are inexpensive, selling for less than $15 per unit. (*See* Ex. 24) The low price point for Zotos' products shows that consumers are not likely to exercise a heightened degree of care. *See Dep Corp. v. Opti-Ray, Inc.*, 768 F. Supp. 710, 716 (C.D. Cal. 1991) (degree of care exercised by purchasers of inexpensive hair care products was low).

**C.     MOROCCANOIL IS LIKELY TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF**

**1.     Irreparable Harm is Common in Trademark Contexts, and Moroccanoil's Evidentiary Threshold is Low**

In addition to the likelihood of consumer confusion caused by the Majestic Oil Products, Moroccanoil is also likely to suffer irreparable harm if Zotos is permitted to continue distributing, marketing, and selling the Majestic Oil Products during the

---

[3] Though Moroccanoil is not yet aware of other evidence of actual confusion between the Majestic Oil and Moroccanoil products, it is well settled that evidence of actual confusion is not necessary to a finding of likelihood of confusion. *See Golden Door, Inc. v. Odisho*, 646 F.2d 347, 351 (9th Cir. 1980) (affirming preliminary injunction absent actual confusion).

1   pendency of this action and is therefore entitled to preliminary relief.  "Irreparable

2   harm" means that monetary damages will be inadequate to compensate for the injuries

3   likely to be suffered in connection with the continuing infringement.  *Herb Reed*

4   *Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

5   "The law does not require the identified injury to be certain to occur, but it is not

6   enough to identify a purported injury which is only theoretical or speculative." *Earth*

7   *Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1311 (9th Cir. 2003).   As the

8   probability of success on the merits of the trademark and trade dress claims increases,

9   the required degree of irreparable harm decreases. *Stark v. Diageo Chateau & Estate*

10  *Wines Co.*, 907 F. Supp. 2d 1042, 1050 (N.D. Cal. 2012); *Cinedigm Corp. v. Gaiam*

11  *Inc.*, 2015 WL 2084590 at *8 (C.D. Cal. 2015).

12          While irreparable harm is generally no longer *presumed* to stem from likelihood

13  of success, courts still regularly find a likelihood of irreparable harm in trademark

14  contexts, often because damage to a brand or reputation is extremely difficult to

15  quantify.  "Following issuance of the Supreme Court's decision in *eBay Inc. v.*

16  *MercExchange, L.L.C.* […] a court may no longer presume irreparable injury from the

17  bare fact of liability in a copyright or trademark case.  Nonetheless, the injury caused

18  by the presence of infringing products in the market – such as lost profits and

19  customers, as well as damage to goodwill and business reputation – will often

20  constitute irreparable injury."  *Starbucks Corp. v. Heller*, 2014 WL 6685662 at *8

21  (C.D. Cal. 2014); *Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1028 (C.D.

22  Cal. 2011).  "Irreparable harm is especially likely in a trademark case because of the

23  difficulty of quantifying the likely effect on a brand of a nontrivial period of consumer

24  confusion (and the interval between the filing of a trademark infringement complaint

25  and final judgment is sure not to be trivial)." *Kraft Foods Grp. Brands LLC v. Cracker*

26  *Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013).

27          Here, because Moroccanoil's probability of success is high, the required showing

28  of irreparable harm is lessened.  The evidence nevertheless shows that Moroccanoil is

1  likely to suffer a significant degree of irreparable harm to its brand, reputation,
2  goodwill and customer base if a preliminary injunction is not granted and Zotos'
3  infringement of the Moroccanoil Trademarks and Trade Dress is allowed to continue.

4

5  ## 2.  Irreparable Harm in the Trademark Context

6  "Evidence of threatened loss of customers or goodwill certainly supports a
7  finding of the possibility of irreparable harm. Irreparable injury exists where a court
8  reasonably concludes that continuing infringement will result in loss of control over the
9  plaintiff's reputation and good will." *Am. Rena Int'l Corp v. Sis-Joyce Int'l Co.*, 2012
10 WL 12538385 at *9 (C.D. Cal. 2012) (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D.*
11 *Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir.2001) and *Maxim Integrated Prods., Inc.*
12 *v. Quintana*, 654 F.Supp.2d 1024, 1035–36 (N.D.Cal.2009)); *see also Kalologie*
13 *Franchising LLC v. Kalologie Skincare Med. Grp. of California*, 2014 WL 953442 at
14 *5 (C.D. Cal. 2014).  "Trademarks serve as the identity of their owners and in them
15 resides the reputation and goodwill of their owners. Thus, if another person infringes
16 the marks, that person borrows the owner's reputation, whose quality no longer lies
17 within the owner's control. A trademark owner's loss of the ability to control its marks,
18 thus, creates the potential for damage to its reputation." *Seed Servs., Inc. v. Winsor*
19 *Grain, Inc.*, 868 F. Supp. 2d 998, 1005 (E.D. Cal. 2012); *see also McCarthy on*
20 *Trademarks* § 30:46 (4th ed. 2010) ("Like trying to un-ring a bell, trying to
21 'compensate' after the fact for damage to business goodwill and reputation cannot
22 constitute a just or full compensation").  Targeting of a senior user's customers is actual
23 evidence of likely irreparable harm to the mark holder's control. *Stuhlbarg*, 240 F.3d at
24 841; *Dish Network L.L.C. v. Ramirez*, 2016 WL 3092184 at *6 (N.D. Cal. 2016).

25 Another related manner in which goodwill can be harmed is through the
26 introduction of infringing products at lower price points or in channels in which the
27 trademark owner has chosen not to sell its goods.  "Loss of goodwill may include a
28 change in the marketplace resulting from customers establishing relationships with low-

cost infringers. The customers may then refuse to pay higher prices for a product after years of paying lower prices to infringers." *QBAS Co. v. C Walters Intercoastal Corp.*, 2010 WL 7785955 at *12 (C.D. Cal. 2010) (patent infringement context); *Quiksilver, Inc. v. Kymsta Corp.*, 360 F. App'x 886, 889 (9th Cir. 2009) (in trademark context, court held that difference in price point of infringing product could damage the plaintiff's brand).

The facts of the various cases are illustrative.  For example, in *Well Care Pharmacy II, LLC v. W' Care, LLC*, 2013 WL 3200111 (D. Nev. 2013), the court found likely irreparable injury from the similarities of the marks and channels of sale. "In this case, as discussed above, the similarities between the marks and the identical market in which the parties operate will likely result in consumer confusion. Such confusion poses an ongoing risk of irreparable injury to Plaintiff's goodwill and reputation." *Id.* at *8.  Similarly , in *Am. Rena Int'l Corp v. Sis-Joyce Int'l Co.*, 2012 WL 12538385 (C.D. Cal. 2012), where the defendant sold an infringing line of skin care products with substantial similarities to the plaintiff's trade dress and marks, the court held that active recruitment of the plaintiff's customers by the defendant and the concurrent loss of control over the plaintiff's business reputation resulted in the likelihood of irreparable harm.  *Id.* at *9. *Accord Seed Servs., Inc. v. Winsor Grain, Inc.*, 868 F. Supp. 2d 998, 1005 (E.D. Cal. 2012), ("evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm").  In *Extreme Reach, Inc. v. Spotgenie Partners, LLC*, 2013 WL 12081182 at *7 (C.D. Cal. 2013) and *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 602 F. App'x 669, 672 (9th Cir. 2015), the courts found that even an inference that a defendant used a plaintiff's trade secrets in order to compete was sufficient to demonstrate a targeting of plaintiff's customers and likely irreparable harm.

In *adidas Am., Inc. v. Skechers USA, Inc.*, 149 F. Supp. 3d 1222 (D. Or. 2016), the court granted a preliminary injunction finding irreparable harm from loss of control of its brand, and highlighted the fact that "adidas has spent significant time and money

in building and maintaining its perception among consumer as a premium sports brand," while "consumers perceive Skechers as a lower end value brand. This was "a quintessentially irreparable [loss-of-control] injury." *Id*. at 1249.  A similar fact pattern, based again on evidence of the time, effort, and money spent to build the mark owner's brand, resulted in an injunction in *Toyo Tire & Rubber Co. v. Kabusikiki Kaisha Tokyo Nihoon Rubber Corp*, 2015 WL 6501228 at *4 (D. Nev. 2015).

In *Starbucks Corp. v. Heller*, 2014 WL 6685662 (C.D. Cal. 2014), the court granted Starbucks an injunction and noted Starbucks' selectivity in its distribution channels and its efforts to police and monitor such channels. The court found that the infringer's "selling [of] products in locations where Starbucks prohibits sales" and "depriving Starbucks of potential authorized accounts [and] its ability to exercise quality control" were "difficult to quantify and compensate over time" and "ample" evidence of irreparable harm.  *Id*. at *8-9; *see also Kreation Juicery, Inc. v. Shekarchi*, 2014 WL 7564679 at *12 (C.D. Cal. 2014).

### 3.     The Evidence Demonstrates that Moroccanoil Is Likely to Be Irreparably Harmed by the Infringing Majestic Oil Products

Here, numerous indicia from the above-referenced injunction-granting cases are present.  As such, the Majestic Oil Products, which are being sold through a growing number of outlets, are likely to cause actual irreparable and imminent harm to Moroccanoil. This harm to Moroccanoil stems from the loss of control of reputation, Zotos' clear targeting of Moroccanoil customers, and Zotos' interference with Moroccanoil's ability to maintain its image as a premium brand by selecting its price points and sales and marketing channels.

As in the *adidas* and *Toyo Tire* cases, Moroccanoil is a premium personal care brand in which Moroccanoil has made "substantial investment" over many years to preserve this high-end association.  (Weizmann Decl. ¶ 4; Krzypow Decl. ¶¶ 7-8; Dkt. No. 4, pg. 4 (numerous related infringement cases)).  Like the infringing Skechers shoes, the Majestic Oil Products are sold at a lower "value brand" price point, which

1  undermines customer perception of Moroccanoil's brand and Moroccanoil's investment

2  therein and is "quintessentially irreparable." (Decker Rep. ¶ 19) This "value"

3  positioning is particularly harmful to premium brands in the hair care industry, as the

4  loss of consumer perception of a brand as "premium" is difficult, if not impossible, to

5  reinstate. (*Id*. at ¶ 12-13 (discussing examples of erosion of premium hair care brands))

6        Like the *Starbucks* case, Moroccanoil is "highly selective" in choosing the

7  channels in which it is sold, deeming "certain categories of locations [to] fall outside

8  the boundaries of acceptable … locations due to the potential for an experience

9  inconsistent with the high quality expected of the … brand." (Elarar Decl. ¶¶ 4-10);

10 *Starbucks*, 2014 WL 6685662 at *2.  Majestic Oil's intrusion into the market deprives

11 Moroccanoil of the ability to either select or exclude such channels and results in

12 irreparable injury.

13       Moreover, and as was pivotal in the *Seed Services* and *Am. Rena* cases, it is clear

14 that Zotos is targeting and attempting to erode Moroccanoil's customers, including by

15 certain advertisements and email blasts, its social media, and its solicitation of

16 Moroccanoil trade secrets at the same time it was developing the copycat Majestic Oil

17 products.[4] (*See* Exs. 27, 29); *see also Extreme Reach, Inc.*, 2013 WL 12081182 at *8

18 ("a customer that receives an offer of a lower rate after being targeted … is much more

19 likely to take its business elsewhere").

20       Finally, as explained above, the Majestic Oil Products are each strikingly similar

21 to the trade dress of the Moroccanoil Products they imitate, and are the same types of

22 products sold to the same types of consumers. This substantial overlap is likely to lead

23 _____

24  [4] Zotos is likely to claim that because the Majestic Oil Products are *sometimes* advertised with
"Compare to Moroccanoil" language, that there should be no consumer confusion. But this argument

25 is unavailing. First, not all Majestic Oil Products *are* advertised in such a manner (Ex. 26).  Second,
simply adding such language does not permit Zotos to infringe Moroccanoil's trademarks and trade

26 dress.  *See, e.g.*, *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 308 fn. 7 (9th Cir.
1992) ("A soft drink competitor would be entitled to compare its product to Coca–Cola or Coke, but

27 would not be entitled to use Coca–Cola's distinctive lettering").

28

-23-

1   to an unquantifiable erosion of the reputation and goodwill established by Moroccanoil

2   in the personal care industry, as held in the *Well Care* and *Am. Rena* cases, among

3   numerous others. Further, while Majestic Oil was only just introduced into the market,

4   Zotos' other more longstanding brands (such as Bain de Terre, Naturelle Biotera, and

5   180PRO) have received harsh reviews from customers – conditioner that "smells like

6   feet" or "smells like bad body odor," hydrator that "ruined my hair," perm products that

7   "left my hair burned to a crisp" and caused hair to "fall out in clumps," and a hair

8   straightener that caused a customer to implore "whatever you do, do not put this in your

9   hair!" (Ex. 37) These real-world examples demonstrate the actual threat of

10  Moroccanoil's lack of control over Zotos' products.

11      Given all of the foregoing, it is plain that Moroccanoil is likely to suffer

12  irreparable harm should Zotos' infringement not be enjoined.

13

14      **D.    THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR**

15      Because the likelihood of confusion factors favor Moroccanoil, the balance of

16  hardships also tips sharply in Moroccanoil's favor. *Ocean Garden, Inc. v. Marktrade

17  Co.*, 953 F.2d 500, 508 (9th Cir. 1991) ("Given the above six [*Sleekcraft*] factors

18  [favoring the plaintiff], the balance of hardships tips sharply in [plaintiff's] favor and it

19  would have been an abuse of discretion for the district court *not* to grant the preliminary

20  injunction."); *Dr. Seuss Enter., L.P. v. Penguin Books, U.S.A.*, 109 F.3d 1394, 1406

21  (9th Cir. 1997) (plaintiff's substantial goodwill outweighed defendant's expense).

22      "Where the only hardship that the defendant[s] will suffer is lost profits from an

23  activity which has been shown likely to be infringing," no equitable considerations

24  support defendants. *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1081

25  (E.D. Cal. 2009), *aff'd*, 348 F. App'x 288 (9th Cir. 2009); *Windsurfing Int'l v. AMF*,

26  782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects to build a business on a

27  product found to infringe cannot be heard to complain if an injunction against

28  continuing infringement destroys the business so elected.").

1    Zotos cannot point to any harm beyond being prohibited from selling its

2    confusingly similar imitations of Moroccanoil's products. The Majestic Oil products

3    make up only one of Zotos' numerous hair care lines, and so the requested injunction

4    would still allow Zotos to sell the vast majority of its other, non-infringing products.

5    Thus, Zotos will suffer no unwarranted hardship by the issuance of a preliminary

6    injunction, while the harm to Plaintiffs without one, as discussed above, is great.

7

8    ### E.    AN INJUNCTION IS IN THE PUBLIC INTEREST

9    "In the trademark context, courts often define the public interest at stake as the

10   right of the public not to be deceived or confused." *CytoSport*, 617 F. Supp. 2d at 1081

11   (citing  *Moroccan Gold*, 590 F. Supp. 2d at 1282; *Davidoff & Cie, S.A. v. PLD Int'l*

12   *Corp.*, 263 F.3d 1297, 1304 (11th Cir.2001) (noting the public interest is served by

13   avoiding confusion in the marketplace)). "When a trademark is said to have been

14   infringed, what is actually infringed is the right of the public to be free of confusion and

15   the synonymous right of the trademark owner to control his products' reputation." *Id.*

16   Because Zotos' Majestic Oil products are likely to create consumer confusion, a

17   preliminary injunction serves the public interest. *See Brookfield Commc'ns, Inc.*, 174

18   F.3d at 1066.

19

20   ## IV.   CONCLUSION

21   For the foregoing reasons, Moroccanoil respectfully requests that the Court enter

22   the concurrently-filed Proposed Order enjoining Zotos' further infringement of the

23   Moroccanoil Trademarks and Trade Dress.

24   Dated:  November 10, 2016

25                              By: */s/ Zachary Page*

26                                  Zachary Page
                                    CONKLE, KREMER & ENGEL PLC
27                                  Attorneys for Plaintiffs

28